**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALBERTO MORINA, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  14-1394 |
| NEIMAN MARCUS GROUP, INC. | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER, S. J.                                            September 30, 2014

Currently pending before the Court is the Motion by Defendant The Neiman Marcus Group, LLC[1] ("Defendant") to Dismiss Plaintiff Alberto Morina ("Plaintiff")'s Complaint and Compel Arbitration.  For the following reasons, the Motion is granted.

**I.       FACTUAL BACKGROUND**

**A.  <u>Plaintiff's Employment and Termination</u>**

Plaintiff is a seventy-one year old resident of Philadelphia, Pennsylvania who formerly worked at Defendant's store in King of Prussia, Pennsylvania.  (Compl. ¶¶ 6, 8, 10.)  Defendant is a nationwide retailer of luxury goods.  (Def.'s Mem. Supp. Mot. Dismiss Ex. 1, Declaration of Nina Kern, July 10, 2012, ("Kern Decl.") ¶ 1.)

Plaintiff began his employment with Defendant on July 23, 2001 as a Fitter/Tailor.  (Compl. ¶¶ 9–10.)  Plaintiff was responsible for customer alterations.  (Compl. ¶ 14b.)  If a salesperson sold Neiman Marcus clothes to a customer who required alterations, the salesperson

---

[1] According to Defendant's counsel, Defendant The Neiman Marcus Group, LLC was improperly named in Plaintiff's Complaint as Neiman Marcus Group, Inc.  (Defendant's Letter to Court, Aug. 14, 2014.)

would call Plaintiff to come to the sales floor to take the customer's measurements.  (Id.)  At that time the salesperson would hand Plaintiff two work tickets.  (Id.)

In June 2012, Plaintiff attended an Alterations Department meeting where he informed Human Resources Director Michael Piros and General Manager Melissa Dietz that salesmen were deleting the alteration charges on his work tickets for suit alterations.  (Id. ¶ 14a.)  The deletion of tailoring charges from work tickets is against Defendant's Policies and Rules and financially penalized Plaintiff.  (Id.)  Plaintiff asserts that the violations of Defendant's Policies and Rules should have resulted in discipline against the salesmen who deleted the tailoring charges.  (Id.)  Plaintiff states that the salesmen were substantially younger than him.  (Id.)  According to Plaintiff, "[t]he practice of deleting the tailoring charges on Plaintiff's tickets was allowed to occur by his Manager, Kinh Huynh, who Plaintiff avers became determined to fire him at the first opportunity.  Approximately a month to a month and a half later, Plaintiff's former manager struck back at Plaintiff and used the pretext [described in the Complaint] to terminate him."  (Id.)

Two weeks prior to his termination, Plaintiff received a call from a salesperson, Steve Shuster, requesting that Plaintiff come to the sales floor to measure a customer.  (Id. ¶ 14b.)  Plaintiff arrived to the sales floor and asked Mr. Shuster for the work tickets, but as Mr. Shuster was walking away he said "no ticket."  (Id.)  Plaintiff interpreted that to mean that there was no work ticket related to the requested measurement.  (Id.)  Plaintiff did not want to make the customer wait, so he looked at the sleeves on the customer's jacket and gave the customer his opinion about alterations, but did not give him a price for the necessary work.  (Id. ¶ 14c.)  Afterward, Plaintiff went back to his workspace.  (Id. ¶ 14d.)  The following day, Plaintiff saw Mr. Shuster in a side room off of the sales floor and told Mr. Shuster that the customer had

"declined work on the jacket."  (Id. ¶ 14e.)  In response, Mr. Shuster told Plaintiff that the man was not a customer, but was Mr. Shuster's friend, and that the jacket was not a Neiman Marcus jacket, but that the friend had purchased it in Italy.  (Id.)  At that point, "Plaintiff confronted the salesperson as friends, [saying] 'what the f***, you know I'm not allowed to work on non Neiman Marcus stuff.'"  (Id. ¶ 14f.)

On August 1, 2012, two weeks after Plaintiff confronted Mr. Shuster, Plaintiff was finishing his shift and was asked to stop by the Supervisor's office, where he was informed that he was being terminated for cursing in the backroom area used by the tailors.  (Id. ¶¶ 14g, 15, 19.)  Plaintiff maintains that he did not receive any warnings or write-ups for the cursing prior to his termination, and that prior to the confrontation with Mr. Shuster he had never received any warnings or been disciplined.  (Id. ¶ 14h.)  Plaintiff asserts that "the backroom workers, similarly situated to Plaintiff, regularly use curse words" and that certain backroom workers, including Plaintiff's supervisor, Kinh Huynh, "actually discussed and joked about their sex lives."  (Id. ¶ 15.)  Plaintiff further asserts that no discipline was imposed for those conversations, "although such sexually laced discussions by Kinh Huynh and other backroom workers would violate Defendant's policies."  (Id.)

Plaintiff believes Defendant's actions were retaliatory because he had been employed by Defendant for eleven years and had not had any disciplinary actions in that time.  (Id. ¶ 15.)  Plaintiff was replaced by two tailors who are both in their thirties.  (Id. ¶ 22.)

**B.  The Arbitration Agreement**

On June 30, 2007, Plaintiff signed an acknowledgment form for Defendant's mandatory arbitration agreement ("the 2007 Agreement").  (Def.'s Mot. Dismiss and Compel Arbitration ¶ 2; Ex. A, The Neiman Marcus Group Inc. Mandatory Arbitration Agreement; Ex. B, The Neiman

Marcus Group, Inc. Mandatory Arbitration Agreement Associate Acknowledgment Form ("the 2007 Acknowledgment Form").)  Among other provisions, the 2007 Agreement provides that Plaintiff must arbitrate all potential claims arising out of his employment and termination, including but not limited to claims arising under the ADEA and any other federal or state discrimination statute.  (Def.'s Mot. Dismiss and Compel Arbitration ¶ 4.)  The 2007 Acknowledgement Form bears Plaintiff's printed name and signature, his employee PIN number, and the date of June 30, 2007.  (2007 Acknowledgment Form.)  The 2007 Acknowledgment Form states:

> I understand that the Arbitration Agreement is an **important legal document** that requires me to submit all complaints, disputes, and legal claims ("Disputes") I have against the Company, and the Company to submit **all Disputes** it has against me, to **binding arbitration**;
>
> I understand that the Arbitration Agreement means both I and the Company are **waiving the right to a trial by jury or a trial before a judge** in a court of law on all Disputes.

(Id. (emphasis in original).)  The 2007 Acknowledgment Form also states that the 2007 Agreement "is **not optional**" but "is **mandatory** and a condition and term of my employment . . . ."  (Id. (emphasis in original).)

The 2007 Agreement's choice of law clause specifies that the Agreement "shall be construed, governed by, and enforced in accordance with the laws of the State of Texas . . . except that for claims or defenses arising under federal law, the arbitrator shall follow the substantive law as set forth by the United States Supreme Court and the United States Court of Appeals for the Fifth Circuit."  (2007 Agreement ¶ 16.)  The 2007 Agreement also contains an Enforcement clause, which states that "[a]ny dispute concerning this agreement – the way it was formed, its applicability, meaning, scope, enforceability, or any claim that all or part of this

Agreement is void or voidable – is subject to arbitration under this Agreement and shall be determined by the arbitrator." (Id. ¶ 19.)  The 2007 Agreement states that it "can be amended, modified, or revoked in writing by the Company at anytime, but only upon thirty (30) days' advance notice to the Covered Employee of that amendment, modification, or revocation." (Id. ¶ 21.)

Defendant revised the 2007 Agreement in 2010 pursuant to a settlement agreement with the National Labor Relations Board, and provided copies of the revised agreement ("the 2010 Agreement") to employees with their July 30, 2010 paychecks.  (Def.'s Mem. Supp. Mot. Dismiss and Compel Arbitration 2; Kern Decl. ¶¶ 7–8.)  At that time, employees, including Plaintiff, were also provided with a document titled "Notice of Employment Revisions to the Mandatory Arbitration Agreement," which outlined the changes to the 2007 Agreement.  (Kern Decl. ¶ 8.)  Then, in October 2010, Defendant corrected an error on the cover sheet of the 2010 Agreement and sent a copy of the revised cover sheet to its employees, including Plaintiff, with their October 22, 2010 paychecks.  (Id. ¶ 9.)  Defendant asserts that the changes implemented in the 2010 Agreement or the revised cover sheet are not relevant to Plaintiff's claims.  (Def.'s Mem. Supp. Mot. Dismiss and Compel Arbitration 3.)

The 2010 Agreement has an effective date of July 15, 2007, the same as the effective date of the 2007 Agreement (2010 Agreement at 1; 2007 Agreement at 1.)  The choice of law provision in the 2010 Agreement states that "[t]his Agreement shall be construed, governed by, and enforced in accordance with the laws of the State of Texas . . . except that for claims or defenses arising under federal law, the arbitrator shall follow the substantive law as set forth by the United States Supreme Court and the United States Court of Appeals for the Circuit where the act giving rise to the arbitration claim is alleged to have been committed." (2010 Agreement

¶ 16.)  The choice of law provision in the 2010 Agreement also states that "[t]he parties recognize that the Company operates in many states in interstate commerce.  **Therefore, it is acknowledged and agreed that the Federal Arbitration Act, 9 U.S.C § 1,** *et seq[.]*, **shall govern this Agreement and the arbitration**."  (Id. (emphasis in original).)

### C.  Plaintiff's Affidavit

In an affidavit attached to Plaintiff's Response in Opposition to Defendant's Motion, Plaintiff declared that he needs "assistance in understanding the English language (whether spoken or written)."  (Pl.'s Resp. Opp'n Def.'s Mot. Dismiss and Compel Arbitration, Ex. A, Affidavit of Alberto Morina, July 25, 2014 ¶ 1 ("Morina Aff.").)  Plaintiff asserts that he does not recall ever reading the Mandatory Arbitration Agreement or receiving a copy of the 2007 Agreement, and that he never had the Mandatory Arbitration Agreement explained to him at any time during his employment with Defendant.  (Morina Aff. ¶ 4.)  Plaintiff acknowledges his signature on the 2007 Acknowledgment Form, but adds that "while employed at Neiman-Marcus, I was periodically given papers and told to sign them, which I did.  I would sign and give them back."  (Id.)  Contradicting Ms. Kern's declaration, Plaintiff denies ever being informed that employees made claims to the National Labor Relations Board, what the claims were, the details of any decision or settlement reached or what the terms were, and whether the 2007 Agreement was nullified or what his rights as an employee were.  (Id. ¶ 5.)  Plaintiff denies ever receiving the revised 2010 Agreement or any notice concerning the revisions, and specifically denies that he received those notices with his July 30, 2010 paycheck.  (Id. ¶ 6.)  According to Plaintiff, based on the size of the 2010 Agreement, he believes he never received anything of that size with a paycheck while employed by Defendant.  (Id.)  Plaintiff disputes that the 2010 Agreement is binding on him, stating that Defendant failed to provide it to him.  (Id.)

Plaintiff also denies receiving the revised cover page in October 2010.  (Id. ¶ 7.)  Plaintiff states that:

> [i]f Neiman-Marcus believes I received either their Mandatory Arbitration Agreement during July of 2010 or their further Revised Mandatory Arbitration Agreement during October of 2010, where is their Associate Acknowledgment Form signed by me?  There isn't any such document for either the July 2010 Mandatory Arbitration Agreement or October 2010 "Revisions," to the July 2010 Mandatory Arbitration Agreement because I never received these documents nor was I ever asked to acknowledge receipt of these documents.

(Id. ¶ 8.)  Plaintiff notes that the 2007 Agreement and the revised 2010 Agreement are not identical, and that there are differences in terms and definitions between the two documents, and that he was not provided thirty days' notice prior to amendments or modifications, in violation of Paragraph 21 of the 2007 Agreement and the 2010 Agreement.  (Id. ¶ 9.)  Plaintiff believes therefore that the 2010 Agreement does not apply to him because he did not receive it, and believes that he is not a covered employee under the 2007 Agreement because the 2010 Agreement voided any prior agreements, pursuant to paragraph 23 of the 2010 Agreement.[2]  (Id. ¶ 10.)  Plaintiff also notes that none of the exhibits Defendant submitted include a signature page containing both Plaintiff's signature and a signature from an individual acting on behalf of Defendant.  (Pl.'s Resp. Opp'n Mot. Dismiss and Compel Arbitration 4–5.)

### D.  Pierson Declaration

In response to Plaintiff's affidavit, Defendant submitted the declaration of Michael Pierson, Defendant's Human Resources Manager at the King of Prussia location.  (Def.'s Second Mem. Supp. Mot. Dismiss and Compel Arbitration, Ex. 1, Declaration of Michael Pierson, Aug.

---

[2] Paragraph 23 of the 2010 Agreement states that "[t]his Agreement constitutes the sole and entire agreement of the parties on the subject of arbitration of disputes.  This Agreement supersedes any prior or contemporaneous oral or written agreements or understandings between the parties on the subject."  (2010 Agreement ¶ 23.)

27, 2014 ("Pierson Decl.").)  Mr. Pierson declares that he personally stapled the 2010 Arbitration

Agreement and Notice to the July 30, 2010 paycheck or paystub of every associate at

Defendant's King of Prussia location.  (Pierson Decl. ¶ 7.)  Mr. Pierson states that Plaintiff was

among the associates who received the revised 2010 Agreement and Notice with his July 30,

2010 paycheck.  (Id. ¶ 9.)  Mr. Pierson also personally stapled the October 2010 revised cover

sheet and Second Notice to the October 22, 2010 paycheck or paystub of every associate at

Defendant's King of Prussia location, and states that Plaintiff was among the associates who

received the revised cover sheet and Notice.  (Id. ¶¶ 11, 13.)  Mr. Pierson declares that to his

knowledge, Plaintiff never complained or otherwise expressed that he did not receive either his

July 30, 2010 paycheck or his October 22, 2010 paycheck.  (Id. ¶ 14.)

### E.  Procedural History

Plaintiff initiated the present litigation[3] on March 7, 2014, setting forth two causes of

action: (1) discrimination on the basis of his age under the Age Discrimination in Employment

Act of 1967 ("ADEA"), 29 U.S.C. § 621, et seq.; and (2) discrimination on the basis of his age in

violation of Section 5(d) of the Pennsylvania Human Relations Act, 43 Pa. Stat. 951 et seq.

(Compl. ¶¶ 17–27.)  The essence of these claims is that Plaintiff was terminated from his

employment with Defendant as a result of his age and in retaliation for complaining about the

deletion of alteration charges on his alteration work tickets, and that Defendant's reason for

terminating Plaintiff's employment was both pretextual and retaliatory.  Defendant filed a

Motion to Dismiss on July 15, 2014.  Plaintiff responded on August 14, 2014.  Defendant

---

[3] Plaintiff asserts that he exhausted his administrative remedies and obtained a right to sue letter
from the Equal Employment Opportunity Commission.  (Compl. ¶ 5.)  Plaintiff also asserts that
Defendant had four or more employees when Defendant's allegedly unlawful conduct occurred.
(Id. ¶ 8.)

submitted a Reply on August 28, 2014.  Plaintiff submitted a Sur-Reply on September 5, 2014.

Defendant's Motion is now ripe for judicial consideration.

## II.      STANDARD OF REVIEW

### A.  <u>Judicial Review of a Motion to Compel Arbitration</u>

Section 2 of the Federal Arbitration Act ("FAA") provides that arbitration agreements

"evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and

enforceable, save upon grounds as exist at law or in equity for the revocation of any contract."  9

U.S.C. § 2.  "The purpose of the Act was to abolish the common law rule that arbitration

agreements were not judicially enforceable."  <u>Cost Bros., Inc. v. Travelers Indem. Co.</u>, 760 F.2d

58, 60 (3d Cir. 1985).  The FAA, therefore, "preempts state law that might 'undercut the

enforceability of arbitration agreements.'"  <u>Id.</u> (quoting <u>Southland Corp. v. Keating</u>, 465 U.S. 1,

16 (1984)).

The FAA creates a strong policy in favor of arbitration.  Any doubt over whether a

particular dispute is covered by an arbitration agreement should be resolved in favor of

arbitration.  <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 650 (1986).

Notably, when ruling on a motion to compel arbitration under the FAA, a court may only

determine whether the merits of the case should be arbitrated or litigated, and may not consider

the merits of the underlying claims.  <u>Great W. Mtg. Corp. v. Peacock</u>, 110 F.3d 222, 228 (3d Cir.

1997).  If a valid agreement exists and the controversy falls within its terms, then, as noted

above, the clause "shall be valid, irrevocable, and enforceable," and the court must mandate

arbitration.  9 U.S.C. § 2.

Nonetheless, a court cannot order the arbitration of any claim unless the parties to a

dispute have agreed to arbitration.  <u>Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.</u>,

247 F.3d 44, 54 (3d Cir. 2000).  Before compelling an unwilling party to arbitrate, the FAA requires the court to ensure that the dispute is arbitrable.  AT&T Techs., 475 U.S. at 648–49; John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1988) (holding that before compelling arbitration, a court must ensure that:  (1) the parties entered into a valid arbitration agreement; and (2) the dispute between the parties falls within the language of the arbitration agreement).  Importantly, prior to granting a motion to compel arbitration, a court "must initially find that there is a valid agreement to arbitrate because the basis for contractual arbitration is consent, not coercion."  Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 523 (3d Cir. 2009) (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995)).  "Because an arbitrator's authority derives solely from the parties' agreement to submit their disputes to arbitration, a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so."  Century Indem. Co., 584 F.3d at 523–24 (citing AT&T Techs., 475 U.S. at 648–49; U.S. Small Bus. Admin. v. Chimicles, 447 F.3d 207, 209 (3d Cir. 2006); China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 289–90 (3d Cir. 2003) (internal citation omitted)).

The United States Court of Appeals for the Third Circuit recently clarified the standards to be applied to motions to compel arbitration, and identified the circumstances under which courts should apply the standard for a motion to dismiss, and under which circumstances courts should apply a summary judgment standard.  If "it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'"  Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 776 (3d Cir. 2013) (quoting Somerset Consulting, LLC v. United Capital Lenders,

LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).  If, however, "the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question.'"  Id.  After any additional discovery is completed, "the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard."  Id.  "In the event that summary judgment is not warranted because 'the party opposing arbitration can demonstrate, by means of citations to the record,' that there is a 'genuine dispute as to the enforceability of the arbitration clause,' the 'court may then proceed summarily to a trial regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions.'"  Id. (quoting 9 U.S.C. § 4).

## III.    DISCUSSION

Defendant moves to dismiss Plaintiff's Complaint in its entirety and to compel arbitration in accordance with Defendant's arbitration agreements.  Plaintiff argues that he is not bound by either the 2007 Agreement or the 2010 Agreement, and may therefore proceed with his federal lawsuit, because: (1) neither agreement is binding on him because he does not remember receiving the 2007 Agreement and asserts that he never received the 2010 Agreement; (2) he has difficulty speaking and reading English and therefore the arbitration agreements are not binding on him; (3) under Texas law, the 2007 Agreement is illusory and therefore unenforceable; (4) Defendant did not sign the 2007 Agreement and it is therefore not binding on Plaintiff; and (5) the 2010 Agreement voided the 2007 Agreement and therefore Plaintiff is not bound by its terms.

A.  **Whether the Parties Agreed to Arbitrate**

1.  **The Appropriate Standard**

As a threshold matter, the Court must first determine whether to consider Defendant's Motion to Compel Arbitration using a motion to dismiss standard pursuant to Rule 12(b)(6) or whether to order the parties to conduct discovery on the question of arbitrability before proceeding to review a renewed motion to compel arbitration using a summary judgment standard.  See Guidotti, 716 F.3d at 776.

a.  **Third Circuit Precedent**

The plaintiff in Guidotti argued that she was not bound by an arbitration clause included in a document because she did not receive that document until after she signed and submitted an account application and agreement, which asked her to acknowledge having read, understood, and received the document containing the arbitration clause and acknowledge that she was bound by all of its terms and conditions.  Id. at 768–69.  The account application and acknowledgement form "gave no indication of what the [document] contained, . . . [and] did not indicate that the [document] had [an] arbitration clause."  Id. at 769.  Additionally, in the plaintiff's response to the defendant's motion to compel arbitration, she attached copies of the relevant documents: the agreement with the acknowledgment form, which had a "DocuSign" header, indicating that it came from the website used during the application phase, and the document containing the arbitration clause, which did not have a header.  Id. at 770.  According to the plaintiff, that difference showed that the document with the arbitration clause was provided to her by mail several weeks after the agreement and acknowledgment form were provided by email.  Id.

The Third Circuit observed that, solely on the basis of the complaint, under a motion to dismiss standard of review the plaintiff could not show that she had not agreed to the arbitration

clause.  Id. at 777.  The complaint, however, was not the only relevant document and the court believed the plaintiff's other evidence could not be ignored.  Id.  The defendants had argued that the plaintiff's "denial in the face of the [acknowledgment form] is a mere 'naked assertion' that she 'did not intend to be bound by the terms' of the [agreement and its arbitration clause]," and that the district court should have granted their motion to compel arbitration without any delay. Id.  The Third Circuit noted that the plaintiff's denial was not "entirely unsupported" because she also relied on the evidence of the DocuSign header appearing on some of the documents, but not the agreement that contained the arbitration clause.  Id.  The question before the court, therefore, was "whether that evidence is sufficient to move the case beyond the pleadings and warrant the application of the summary judgment standard, with its accompanying call for discovery and perhaps a limited trial if a genuine issue of material fact emerges."  Id.  The Third Circuit held that, on the basis of the header evidence and the plaintiff's unsworn claims, the district court should not have denied the defendant's motion to compel arbitration without first permitting limited discovery and only then entertaining the motion using a summary judgment standard.  Id. at 780.

    In reaching its conclusion in Guidotti, the Third Circuit relied on its prior decision in Par-Knit Mills, which held that the issue of whether the parties agreed to arbitrate was one for a jury. Id. at 777 (discussing prior holding in Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 55 (3d Cir. 1980)).  In that case, one of the parties argued that its signatory to the agreement did not have the authority to execute contracts on behalf of the corporation, and also submitted the signatory's sworn affidavit asserting that he had not intended to confirm all provisions of the agreement, but only dates of delivery.  See Guidotti at 778 (discussing Par-Knit Mills).  In Par-Knit Mills the court noted that a naked assertion by a party trying to avoid arbitration would be

13

insufficient, for purposes of the FAA, to place in issue the making of an agreement to arbitrate. Id. (discussing the court's reasoning in Par-Knit Mills, 636 F.3d at 55).  But the court also noted that in Par-Knit Mills "we did not want to cut off legitimate disputes over an alleged agreement to arbitrate when there has been 'an unequivocal denial that the agreement had been made, accompanied by supporting affidavits . . . ; in most cases that should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds.'"  Id. (quoting Par-Knit Mills, 636 F.3d at 55).

The court also relied on its prior decision in Kirleis, where a plaintiff disputed that she was bound by an arbitration agreement and had alleged in a sworn affidavit that she never received a copy of the by-laws which contained the arbitration provision, never signed any agreement or document that referred to the arbitration provision, and had never agreed to arbitrate.  Id. (discussing the facts at issue in Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 159–60 (3d Cir. 2009)).  In that case, the party seeking to compel arbitration "did not 'submit contradictory evidence showing that Kirleis had received the by-laws or had signed them,'" but the court noted that even if it had, the task of weighing the evidence and deciding credibility would have been for a jury because the plaintiff's allegations created a genuine issue of fact regarding the existence of an agreement to arbitrate.  Id. (quoting Kirleis, 560 F.3d at 161–62).

### b.　　Application of *Guidotti*, *Par-Knit Mills*, and *Kirleis* to Plaintiff's Case

In this case, Plaintiff responded to Defendant's Motion to Dismiss and Compel Arbitration with additional facts in the form of a sworn affidavit, but these additional facts are not sufficient to place the 2007 Agreement to arbitrate in issue, nor do they trigger the

application of <u>Guidotti</u>'s framework of additional discovery followed by summary judgment review. [4]

First, unlike in <u>Kirleis</u>, Plaintiff does not allege that he never signed an agreement or document referring to the 2007 Agreement. Defendant produced a copy of the 2007 Acknowledgment Form, which Plaintiff signed on June 30, 2007, as an exhibit to its Motion to Dismiss and Compel Arbitration. Moreover, Plaintiff acknowledged in his sworn affidavit that it is his signature on the 2007 Acknowledgment Form.

Second, in <u>Guidotti</u> the signed acknowledgment forms "gave no indication" of what the related document contained, and did not indicate that the document contained an arbitration clause. <u>Guidotti</u>, 716 F.3d at 769. In contrast, the 2007 Acknowledgement Form signed by Plaintiff explicitly references the 2007 Agreement and also summarizes the effect of signing an arbitration agreement and what would happen in the event of a dispute between Defendant and

---

[4] With regard to the 2010 Agreement, in his affidavit, Plaintiff stated:

> I was not provided with a copy of the July 2010 Mandatory Arbitration Agreement, I was never given any type of notice concerning either any alleged "Revisions" or why these "Revisions" were made. I specifically deny Ms. Kerns' allegations that any alleged Revisions and Notice were provided with my paycheck of July 30, 2010. Looking at the size of the July 2010 Mandatory Arbitration document, I can say I never received anything of that size with a paycheck while employed at Neiman-Marcus.

(Morina Affidavit ¶ 6.)

Defendant has not produced a signed acknowledgment form for the 2010 Agreement to counter Plaintiff's assertion, even though it has submitted an employee declaration explaining the process by which Plaintiff would have received the 2010 Agreement and why Defendant believes Plaintiff did in fact receive the 2010 Agreement. Resolution of whether there was a valid agreement to arbitrate between Plaintiff and Defendant with respect to the 2010 Agreement, however, is not required in order to grant Defendant's Motion to Dismiss and Compel Arbitration because this case can be resolved on the basis of the 2007 Agreement. Accordingly, the Court's analysis is confined to the 2007 Agreement.

one of its employees once they became parties to the 2007 Agreement.  Even if Plaintiff claimed not to have read the 2007 Agreement itself, an issue discussed more fully below, he would have been informed of that document's effect on him by the specifically worded and bolded text in the 2007 Acknowledgment Form: (1) the 2007 Agreement "is an **important legal document** that requires me to submit all complaints, disputes, and legal claims ("Disputes") I have against the Company, and the Company to submit **all Disputes** it has against me, to **binding arbitration**;" (2) the 2007 Agreement "means both I and the Company are **waiving the right to a trial by jury or to a trial before a judge** in a court of law on all Disputes.  Instead, all Disputes must be submitted to final and binding arbitration;" and (3) that the 2007 Agreement "is **not optional**. Rather, it is **mandatory** and a condition and term of my employment if I am employed or continue employment on or after July 15, 2007."  (2007 Acknowledgment Form (emphasis in original).)  By signing a form solely concerning an arbitration agreement and referencing the contents and effect of the actual arbitration agreement, Plaintiff would have been alerted that he was agreeing to binding arbitration.

Third, unlike in Guidotti, Plaintiff has not pointed to any additional evidence, documentary or otherwise, beyond his own affidavit to support his denial of an agreement to arbitration with Defendant.  The discrepancy of the document headers in Guidotti went beyond the plaintiff's assertions that she did not agree to arbitrate, whereas here, Plaintiff has only his otherwise unsupported claim that he does not remember receiving the 2007 Agreement, in spite of having signed the 2007 Acknowledgment Form stating that he did.  Importantly, and unlike the plaintiff in Kirleis, Plaintiff does not claim that he never received the 2007 Agreement—only that he does not recall receiving it.  See Kirleis, 560 F.3d at 162 (drawing a distinction between a plaintiff who stated an inability to recall receiving an arbitration agreement and Kirleis' assertion

that she "was never provided with a copy" of the relevant agreement).  This is the type of situation on which the Third Circuit opined in Par-Knit Mills where they stated that, for purposes of the FAA, a naked assertion from the party trying to avoid arbitration would be insufficient to place the making of an agreement to arbitrate in issue, rather than a situation where there is a legitimate dispute created by "'an unequivocal denial that the agreement had been made, accompanied by supporting affidavits.'"  See Guidotti, 716 F.3d at 778; Par-Knit Mills, 636 F.3d at 55.

The facts of this case and the evidence submitted by the parties do not trigger the application of the discovery and summary judgment review framework set forth in Guidotti, and therefore the correct standard of review for this motion is for a Rule 12(b)(6) motion to dismiss. As Plaintiff signed the 2007 Acknowledgment Form for the 2007 Agreement, and because Plaintiff has not responded to Defendant's Motion to Compel arbitration with additional facts which are sufficient to place the agreement to arbitrate in issue, the Court finds that Plaintiff did agree to arbitration with respect to the 2007 Agreement.

### 2.  **Plaintiff's Additional Validity Arguments**

#### a.  **Applicable Body of Law**

Having determined that Plaintiff agreed to the 2007 Agreement, the Court must next decide which state's body of law applies to determine whether Plaintiff's additional arguments affect the validity of that agreement.  Plaintiff urges the Court to rely on Texas law while Defendant argues that Pennsylvania contract law applies.

 "To determine whether the parties have agreed to arbitrate, [courts] apply 'ordinary state-law principles that govern the formation of contracts.'"  Century Indem. Co., 584 F.3d at 524 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) ("A federal court

must generally look to the relevant state law on the formation of contracts to determine whether there is a valid agreement to arbitrate under the FAA"); Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987)).

The choice of law provisions in the 2007 and 2010 Agreements specify that they will be "construed, governed by, and enforced in accordance with the laws of the State of Texas." Those provisions, however, do not dictate which jurisdiction's laws will govern the matter of validity—in other words, whether an agreement, or contract, to arbitrate existed between the parties.  "In essence, [the parties] have agreed [about which] state's law will control those issues involving their rights and duties under the contract itself.  A breach of contract claim is clearly contemplated.  Beyond this, the parties did not go."  Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999).  "Significantly, [the parties] did not refer to the matter of contract validity.  If these sophisticated parties had wanted a more expansive choice of law provision, they could easily have drafted one.  For example, as other parties have done, [the parties] could have inserted language that Delaware law governed "'all matters, including, but not limited to, matters of validity, construction, effect or performance . . . .'  They did not, and we will not rewrite the contract for them."[5]  Id.  (emphasis in original) (internal citations omitted).

Since the arbitration agreements do not include a choice of law provision with regard to which state's contract law should be used in determining the validity of the agreements, the Court must decide which body of law applies to that determination.  Without engaging in a

---

[5] Coram Healthcare dealt with a contract where both parties presumably had some level of control over the final contract language.  The sophisticated party in this matter is Defendant, who had sole drafting authority for the arbitration agreement presented to Plaintiff.  As Defendant could have chosen to include language dictating which state's contract law would apply to issues of agreement validity, but did not, the Court will apply Pennsylvania law.

protracted conflict of law analysis, numerous factors support the application of Pennsylvania law, including: the conduct complained of in Plaintiff's lawsuit occurred in Pennsylvania, Plaintiff lives in Pennsylvania, and Plaintiff filed a Pennsylvania state law claim along with his federal claim.  Accordingly, Pennsylvania contract law principles apply to Plaintiff's additional contract validity arguments.[6]

---

[6] "In general, to determine whether a contract was formed under Pennsylvania law, a court must look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms are sufficiently definite to be enforced; and (3) whether there was consideration." Century Indem. Co., 584 F.3d at 533 (citing Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002); Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999); Quiles v. Fin. Exch. Co., 879 A.2d 281, 285 (Pa. Super. 2005) (equating principles for interpreting agreements to arbitrate with general principals of contract formation)).

For the reasons discussed above, Plaintiff manifested an intention to be bound by the agreement by signing the 2007 Acknowledgment Form and by continuing to work for Defendant. Defendant manifested an intent to be bound by providing the arbitration agreement to all its employees.  The terms of the 2007 Agreement are very specific about the types of disputes which are subject to arbitration, and the procedures by which the arbitration will be conducted, and are therefore sufficiently definite to be enforced.  Finally, there was consideration for Plaintiff's agreement to arbitrate, because Plaintiff continued to work for Defendant, and Defendant continued to employ him.  Eastern District courts have "repeatedly held that continued employment fulfills the consideration requirement under Pennsylvania law." Grant v. Phila. Eagles LLC, No. Civ.A.09-1222, 2009 WL 1845231, at *5 (E.D. Pa. June 24, 2009) (citing Hamilton v. Travelers Prop. & Cas. Corp., No. Civ.A.01-11, 2001 WL 503387, at *2 (E.D. Pa. May 11, 2001) (finding continued employment of two years following receipt of the employee handbook which included an arbitration agreement sufficient to constitute acceptance and consideration); Gutman v. Baldwin Corp., No. Civ.A.02-7971, 2002 WL 32107938, at *4 (E.D. Pa. Nov. 22, 2002); Wilson v. Darden Restaurants, Inc., No. Civ.A.99–5020, 2000 WL 150872, at *3–4 (E.D. Pa. Feb. 11, 2000); Wetzel v. Baldwin Hardware Corp., No. Civ.A. 98–3257, 1999 WL 54563, at *3 (E.D. Pa. Jan. 29, 1999)).  "In addition, when both parties have agreed to be bound by arbitration, adequate consideration exists, and the arbitration agreement should be enforced." Grant, 2009 WL 1845231 at *5 (citing Blair, 283 F.3d at 603–04 (3d Cir. 2002)).  Since Plaintiff continued to work for Defendant for several years after signing the 2007 Agreement, there was adequate consideration.

Accordingly, the necessary elements for contract formation under Pennsylvania law were met.

### b.  __Validity of the 2007 Agreement Under Pennsylvania Contract Law__

Having determined that Pennsylvania law applies, the Court turns to each of Plaintiff's additional arguments regarding the validity of the 2007 Agreement.  Plaintiff disputes that his signature on the 2007 Acknowledgment Form binds him to arbitration because he claims he never read the 2007 Agreement, and because he has difficulty reading and understanding English.

Plaintiff first claims that he does not recall reading the 2007 Agreement, and never had the 2007 Agreement explained to him at any time while he was employed by Defendant. (Morina Aff. ¶ 4.)  Plaintiff acknowledges his signature on the 2007 Acknowledgement Form, but adds that "while employed at Neiman-Marcus, I was periodically given papers and told to sign them, which I did.  I would sign and give them back."  (Id.)  On that issue, "[t]he law of Pennsylvania is clear.  One who is about to sign a contract has a duty to read that contract first." Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169, 1174 (E.D. Pa. 1990) (internal citations omitted).  "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains."  Simeone v. Simeone, 581 A.2d 162, 165–66 (Pa. 1990) (citing Standard Venetian Blind Co. v. Am. Empire Ins. Co., 503 Pa. 300, 305, 469 A.2d 563, 566 (Pa. 1983) (finding that failure to read a contract does not warrant avoidance or nullification of its provisions); Estate of Brant, 344 A.2d 806, 809 (Pa. 1975); Bollinger v. Central Pa. Quarry Stripping & Constr. Co., 229 A.2d 741, 742 (Pa. 1967) ("Once a person enters into a written agreement he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing."); Montgomery v. Levy, 177 A.2d 448, 450 (Pa. 1962) (finding that one is legally bound to know the terms of the

contract entered)).  Accordingly, Plaintiff's claim that he signed the 2007 Acknowledgment Form without reading the 2007 Agreement[7] does not affect the validity of the 2007 Agreement.

Plaintiff also appears to argue that because he has difficulty understanding and reading the English language, there is a question of the 2007 Agreement's validity.  (See Pl.'s Resp. Opp'n Def.'s Mot. Dismiss and Compel Arbitration 1, 2.)  In his affidavit, Plaintiff stated that he needs assistance in understanding spoken and written English; but also stated that he "attended night classes at South Philly High to learn English;" and has "learned English to a certain degree, but [is] not fluent."  (Moraina Aff. ¶¶ 1–2.)  "Applying Pennsylvania law,[8] Courts have upheld contract provisions or signed releases, even where the plaintiff has alleged an impediment to fully reading or understanding the contract."  Arce v. U-Pull-It Auto Parts, Inc., No. Civ.A.06-5593, 2008 WL 375159 (E.D. Pa. Feb. 11, 2008) (citing Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1253 (3d Cir. 1987) ("[N]otwithstanding plaintiff's illiteracy, he is bound to the legal consequences of signing the form."); Gimpel v. Host Enters. Inc., 640 F. Supp. 972, 975 (E.D. Pa. 1986) (enforcing an exculpatory clause and rejecting plaintiff's argument that he could not read the contract before he signed it because he did not have his reading glasses with him when he arrived at the rental office), aff'd, 813 F.2d 397 (3d Cir. 1987); Commonwealth to Use of Liberty Nat. Bank of Pittson v. Gudaitis, 186 A. 82, 83 (Pa. 1936) (holding that mere illiteracy is not grounds to avoid a written instrument); Duran v. Intex Aviation Servs., Inc., No. Civ.A.95-11180, 98 F.3d 1339, 1996 WL 556967, at *5 (5th Cir. 1996) (finding, under Texas law, that

---

[7] As discussed above, the 2007 Acknowledgment Form itself explains the significance of the 2007 Agreement and its effect on employees like Plaintiff and, thus, even without reading the 2007 Agreement itself, Plaintiff would have been aware of the general nature of its contents.

[8] Defendant asserts that it is less clear whether Texas or Pennsylvania law should apply to determine whether Plaintiff's English language abilities affect the validity of the agreements, but that a choice of law analysis is unnecessary because Pennsylvania and Texas law are identical on the issue.

plaintiff's inability to "speak, read, or write English" and thus to "understand the meaning of the papers she signed" did not preclude enforcement of a waiver clause)). Therefore, Plaintiff's argument that he is not bound by the 2007 Agreement because he has difficulty understanding and reading English does not render the 2007 Agreement invalid.

Plaintiff's additional arguments do not, under Pennsylvania law, render invalid his agreement to arbitrate pursuant to the 2007 Agreement. Having found that Plaintiff is bound by the 2007 Agreement and that Plaintiff entered into a valid agreement to arbitrate, the Court will next consider whether the 2007 Agreement is enforceable.

### B. Enforceability of the Arbitration Agreements

Plaintiff asserts that the 2007 Agreement is not enforceable because (1) it is illusory; (2) Defendant did not sign the 2007 Agreement; and (3) the 2007 Agreement was voided by the 2010 Agreement. Pursuant to the 2007 Agreement's Choice of Law clause, the Court will apply Texas law to Plaintiff's first two arguments. (See 2007 Agreement ¶ 16 ("This Agreement shall be construed, governed by, and enforced in accordance with the laws of the State of Texas . . . .").) As the third argument concerns contract formation, rather than construction or enforceability, Pennsylvania law applies. See supra Section A.2.a.

### 1. Plaintiff's Argument that the 2007 Agreement is Illusory

Plaintiff, relying primarily on a California state appellate court opinion applying Texas law, argues that the 2007 Agreement is illusory under Texas law and is therefore unenforceable. In Peleg, a California court found that the agreement at issue was illusory and unenforceable under Texas law because:

> Neiman Marcus may amend, modify, or revoke the Agreement on thirty days' advance written notice, and an amendment, modification, or revocation applies to all claims not filed with the AAA within 30 days thereafter. Under Texas law, a modification

> provision must contain a savings clause expressly exempting all
> claims, accrued or known, from contract changes. But the
> Agreement does not have a savings clause stating that any
> amendments would apply only prospectively.  Absent a savings
> clause of the type in Halliburton . . . reciting that a contract change
> does not apply to any claims that have accrued or of which the
> employer has knowledge—the modification provision permits
> Neiman Marcus to avoid its promise to arbitrate by amending the
> provision or terminating it altogether.

Peleg v. Neiman Marcus Grp., Inc., 204 Cal. App. 4th 1425, 1467 (2012) (internal citations and

quotations omitted).

There are two problems with Plaintiff's reliance on Peleg.[9]  First, a subsequent decision

from a Texas appellate court noted that with respect to the issue of whether an agreement was

illusory under Texas law, "Peleg is not controlling, and we respectfully disagree with its analysis

of Texas law."  Nabors Drilling USA, LP v. Pena, 385 S.W.3d 103, 109 (Tex. App. 2012),

review denied (Oct. 18, 2013).[10]  Second, the dissenting judge in Peleg wrote that "the majority's

conclusion on the enforceability issue is still incorrect as a matter of Texas law.  Under Texas

law, the agreement is not illusory."  Peleg, 204 Cal. App. 4th at 1468 (Rothschild, J., dissenting).

In light of these judicial disagreements with the Peleg court's decision, the Court declines to

apply it here.  See, e.g., Ratay v. Lincoln Nat. Life Ins. Co., 405 F.2d 286, 288 (3d Cir. 1968)

---

[9] According to Plaintiff, Defendant's argument that the 2007 Agreement is not illusory fails
because "while Defendant has disparaged the Peleg decision . . . it has failed to produce a single
opinion or decision upholding either the 2007 or 2010 Mandatory Arbitration Agreements at
issue, from anywhere in the country!"  (Pl.'s Sur-Reply 5 (emphasis in original).)  This argument
is not persuasive.

[10] Plaintiff asserts that Nabors Drilling is inconsistent with Halliburton, but in no way indicates
to the Court why that is so, other than to quote a footnote from its own Response that included a
block quote from Peleg describing a series of Texas lower court decisions that the Peleg majority
deemed inconsistent with Halliburton.  (See Pl.'s Sur-Reply 5–6 (quoting Pl.'s Resp. Opp'n Mot.
Dismiss and Compel Arbitration 13 n.1) (quoting Peleg).)  For the same reasons discussed in this
Opinion, Peleg is not controlling, and this Court's reading of Nabors Drilling does not reveal any
inconsistency with Halliburton.

(citing <u>Vandenbark v. Owens-Illinois Glass Co.</u>, 311 U.S. 538, 543, (1941) for the proposition

that federal courts must apply state law "in accordance with the then controlling decision of the

highest state court").[11]

In determining whether under Texas law the 2007 Agreement is illusory, the Court relies

on a controlling decision from the Texas Supreme Court regarding the question of whether an

arbitration agreement is illusory and unenforceable under Texas law.  In <u>Halliburton</u>, the Texas

Supreme Court held that an employer's newly established dispute resolution program was not

illusory.  <u>In re Halliburton Co.</u>, 80 S.W.3d 566, 569 (Tex. 2002).  The plaintiff had argued that

the employer's promises were illusory because the company retained the right to modify or

discontinue the program.  <u>Id.</u>  The court noted, however, that the program provided that "no

amendment shall apply to a Dispute of which the Sponsor had actual notice on the date of

amendment," and "termination [of the program] shall not be effective until 10 days after

reasonable notice of termination is given to Employees or as to Disputes which arose prior to the

date of termination."  <u>Id.</u> at 569–70.  The court found that the quoted clause meant the employer

could not avoid its promise to arbitrate by amending the provision or terminating it altogether,

and that accordingly the provision was not illusory.  <u>Id.</u> at 570.  The court also noted that

acceptance of a dispute resolution program by continuing employment did not make the dispute

resolution program illusory because even if the plaintiff's employment had ended shortly after

---

[11] Defendant relied on an Eastern District of Pennsylvania case quoting <u>Ratay</u> for this very
proposition.  (<u>See</u> Def.'s Second Mem. Supp. Mot. Dismiss and Compel Arbitration 6 (quoting
<u>Blakesley v. Wolford</u>, 662 F. Supp. 55, 59 (E.D. Pa. 1987).)  "Plaintiff disputes the applicability
of [<u>Blakesley</u>]" because it was "a dental malpractice case tried before a jury in 1984 under
Pennsylvania law" and because the Third Circuit later ruled that Texas law, rather than
Pennsylvania law, should have applied.  (Pl.'s Sur-Reply 6–7.)  While the facts of <u>Blakesley</u> are
certainly distinct from those of this case, the proposition of law quoted in that decision is
nonetheless applicable here.

accepting the employer's offer of the program, the promise to arbitrate would still have been

binding and enforceable on both parties.  Id. at 569.

       In this case, the 2007 Agreement provides that the agreement to arbitrate "shall survive

the termination of the employer-employee relationship between the Company and any Covered

Employee, and shall apply to any covered Claim whether it arises or is asserted during or after

termination of the Covered Employee's employment with the Company . . . ."  (2007 Agreement

¶ 21.)  It also states that the 2007 Agreement

> can be amended, modified, or revoked in writing by the Company
> at anytime, but only upon thirty (30) days' advance notice to the
> Covered Employee of that amendment, modification, or
> revocation.  However, any amendment, modification, or revocation
> will have no effect on any Claim that was filed for arbitration prior
> to the effective date of such amendment, modification, or
> revocation.  However, any amendment, modification, or revocation
> will have no effect on any Claim (a) that was filed for arbitration
> prior to the effective date of such amendment, modification, or
> revocation, or (2) is based on any alleged discriminatory or
> retaliatory conduct that occurred prior to the effective date of such
> amendment, modification or revocation.

(Id.)  As in Halliburton, the "Term, Modification, and Revocation" clause in the 2007 Agreement

would not permit Defendant to avoid its promise to arbitrate by amending or terminating the

2007 Agreement because any claims that had been filed prior to any change or termination to the

2007 Agreement would not be affected by the change or termination.  Also, as in Halliburton,

changes, modifications, and revocations would apply prospectively, not retroactively, to claims

of discrimination or retaliation which are based on conduct which occurred prior to the effective

date of any such amendment, modification, or revocation.  Finally, Defendant's arbitration

agreement continues in effect even if the employment relationship with a particular employee is

terminated.  Accordingly, under Texas law as explained by the Texas Supreme Court in

Halliburton and subsequent decisions discussing that case,[12] the 2007 Agreement is not illusory and therefore is enforceable.

### 2.  Plaintiff's Argument that the 2007 Agreement is not Enforceable Because Defendant Did Not Sign It

Plaintiff next argues that because Defendant has not produced a copy of the 2007 Agreement containing both Plaintiff's signature and the signature of an appropriately designated individual acting on Defendant's behalf, the 2007 Agreement is not enforceable.  Plaintiff asserts that because "neither the Kerns nor Pierson Declarations establish that Defendant herein signed either the 2007 Mandatory Arbitration Agreement or the 2010 Mandatory Arbitration Agreement," the agreements are unenforceable.  (Pl.'s Sur-Reply 1–2.)  Defendant argues that the FAA does not require the parties to sign an acknowledgment form in order for the agreement to be binding, but only that the agreement itself be in writing, and that therefore the lack of a signed acknowledgment form is irrelevant.

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . , or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Thus, under the FAA, a signature is not required for an arbitration agreement to be enforceable.  Like the FAA, Texas law does not require an employer's signature in order for an arbitration agreement to be valid and enforceable.  See Perez v. Lemarroy, 592 F. Supp. 2d 924, 931 (S.D. Tex. 2008) (discussing and applying Texas law and

---

[12] See, e.g., In re AdvancePCS Health L.P., 172 S.W.3d 603 (Tex. 2005); In re Polymerica, LLC, 296 S.W.3d 74 (Tex. 2009); In re Odyssey Healthcare, Inc., 310 S.W.3d 419 (Tex. 2010).

finding that "there is no evidence of an intent in the employment agreement to require [the employer's] signature, or any signature for that matter, as a condition precedent to the agreement or its provisions becoming effective."). Accordingly, the fact that no representative for Defendant signed the 2007 Agreement or the 2007 Acknowledgment Form does not render the 2007 Agreement unenforceable.

Plaintiff argues that the "pertinent issue of what is the important [sic] of unsigned Mandatory Arbitration Agreement has been considered by the Texas court in Nazareth Hall Nursing Center v. Melendez." (Pl.'s Resp. Opp'n Mot. Dismiss and Compel Arbitration 23; see also Pl.'s Sur-Reply 2 ("Plaintiff further notes Defendant did not even attempt to address the critical Texas Appellate Court decision of [Nazareth Hall]. As previously discussed, the critical significance of an unsigned Mandatory Arbitration Agreement has been considered by the Texas court in [Nazareth Hall].") (emphasis in original).) Plaintiff incorporates numerous lengthy paragraphs from that case in his Response, but does not apply Nazareth Hall to the issue of whether Defendant's signature on the 2007 Agreement is required. Presumably, that is because in Nazareth Hall the court did not address the signature issue, and stated that because they were affirming the trial court decision that the agreement was illusory, the court "need not address Nazareth Hall's additional contention that the absence of its signature on the 2006 agreement was not fatal to its right to compel arbitration." Nazareth Hall, 372 S.W.3d 301, 308 (Tex. App. 2012). Thus, Plaintiff's argument is not persuasive.

As neither the FAA nor Texas law requires an employer's signature on an arbitration agreement in order for it to be valid and enforceable, Plaintiff's argument fails. The 2007 Agreement is enforceable even if a representative for Defendant did not sign it.

### 3.  Plaintiff's Argument that the 2010 Agreement Voided the 2007 Agreement Rendering It Unenforceable

In his affidavit, Plaintiff stated "I do not believe I am a covered employee under the Mandatory Agreement of 2007 as the Mandatory Agreement of July 30, 2010 voided any prior Agreements," citing Paragraph 23 of the 2010 Agreement.  (Morina Aff. ¶ 10.)[13]  Paragraph 23 of the 2010 Agreement states that "[t]his Agreement constitutes the sole and entire agreement of the parties on the subject of arbitration of disputes.  This Agreement supersedes any prior or contemporaneous oral or written agreements or understandings between the parties on the subject."  (2010 Agreement ¶ 23.)  Defendant argues that if the 2010 Agreement is unenforceable, then Plaintiff would still be compelled to arbitrate his claims under the 2007 Agreement, which as discussed above is a valid arbitration agreement between Plaintiff and Defendant.

Under Pennsylvania law,[14] a subsequent contract acts as a novation when the following elements are present: the displacement and extinction of a valid contract; the substitution for it of a valid new contract; sufficient legal consideration for the new contract; and the consent of the parties.  See Buttonwood Farms, Inc. v. Carson, 478 A.2d 484, 486 (Pa. Super. 1984) (emphasis in original) (quoting Yoder v. T.F. Scholes, Inc., 173 A.2d 120, 121–122 (Pa. 1961)).  "The party asserting a novation or substituted contract has the burden of proving that the parties intended to discharge the earlier contract."  Id.  "Such intention of the parties to effect a novation or

---

[13] While Plaintiff's counsel incorporated the statements in Plaintiff's affidavit into the fact section of Plaintiff's Response, counsel neither directed the Court to any case law supporting Plaintiff's position, nor included any arguments to that effect.

[14] Plaintiff asserts that the 2007 Agreement is no longer enforceable because it was voided by the 2010 Agreement.  Novation concerns the formation of contracts and their effect on previous agreements, and accordingly this issue is considered in accordance with Pennsylvania law.  See supra Section A.2.a.

substituted contract may be shown by other writings, or by words, or by conduct or all three."

Id. (internal citations omitted).  "Without the extinguishment of the earlier contract, there can be

no novation."  Id. at 487 (citing Advanced Mgmt. Research Inc. v. Emanuel, 266 A.2d 673 (Pa.

1970)).

Although Plaintiff is the party asserting a novation, he has not shown that he intended to

discharge the earlier 2007 Agreement with the 2010 Agreement because he specifically argues

that he did not consent to the 2010 Agreement and that it is not binding on him.  As Plaintiff is

not, according to his own words, a party to the 2010 Agreement, that contract cannot have

displaced or extinguished the 2007 Agreement.  Since there was no novation, the 2007

Agreement still applies to Plaintiff and still applies to Defendant with respect to Plaintiff, even if

it would not apply to Defendant's other employees who became parties to the 2010 Agreement.

Accordingly, Plaintiff and Defendant are still bound by the terms of the 2007 Agreement.

## IV.    CONCLUSION

In light of the foregoing, the Court finds that the 2007 Agreement is both valid and

enforceable, and that Plaintiff is bound by his agreement to arbitrate with Defendant.  As

Plaintiff's ADEA claim is included within the types of disputes governed by the 2007

Agreement,[15] Defendant's Motion to Dismiss and Compel Arbitration is granted and Plaintiff's

Complaint is dismissed.

An appropriate Order follows.

---

[15] The 2007 Agreement provides that claims for "[d]iscrimination or harassment on the basis of .
. . age, . . . including but not limited to, claims alleged under the Age Discrimination in
Employment Act ("ADEA")" are covered by the agreement.  (2007 Agreement ¶ 3.)